IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

DEIDRE MACK WHITE,                    )
                                      )    CASE NO. 1:20-CV-00588-JDG
                                      )
           Plaintiff,                 )
                                      )
      vs.                             )    MAGISTRATE JUDGE
                                      )    JONATHAN D. GREENBERG
COMMISSIONER OF SOCIAL                )
SECURITY,                             )    **MEMORANDUM OF OPINION AND**
                                      )    **ORDER**
           Defendant,                 )
                                      )

        Plaintiff, Deidre Mack White ("Plaintiff" or "White"), challenges the final decision of Defendant,

Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her application for a Period

of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security

Act,42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below,

the Commissioner's final decision is VACATED AND REMANDED FOR FURTHER

CONSIDERATION CONSISTENT WITH THIS OPINION.

## I.      PROCEDURAL HISTORY

        In October 2017, White filed an application for POD and DIB, alleging a disability onset date of

April 1, 2014[2] and claiming she was disabled due to post-concussive syndrome, depression, and

migraines.  (Transcript ("Tr.") at 15, 58.)  The application was denied initially and upon reconsideration,

and White requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

[2] White moved to amend the alleged onset date to April 1, 2014, which the ALJ granted.  (Transcript ("Tr.") at 15.)

On March 5, 2019, an ALJ held a hearing, during which White, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On April 25, 2019, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 15-30.)  The ALJ' s decision became final on February 13, 2020, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On March 18, 2020, White filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 17, 19.)  White asserts the following assignments of error:

(1)   The ALJ's RFC is contrary to law and not supported by substantial evidence because the ALJ did not fully account for Plaintiff's migraine headaches, failing to adhere to the Agency's rules for evaluating opinion evidence or give legally sufficient good reasons to reject the opinions.

(2)   The ALJ's "credibility" assessment is also contrary to law and not supported by substantial evidence because of the above error and because of his failure to acknowledge or discuss Plaintiff's excellent work history.

(Doc. No. 17 at 1.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

White was born in January 1973 and was 46 years-old at the time of her administrative hearing (Tr. 15, 28) making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 404.1563(c). She has at least a high school education and is able to communicate in English.  (Tr. 28.)  She has past relevant work as an administrative clerk, case aide, social services aide, and china/glassware/silverware salesperson.  (*Id.*)

2

**B.**      **Relevant Medical Evidence[3]**

On June 28, 2013, White went to the emergency room after she tripped on a ledge at work and fell, hitting her left shoulder and head.  (Tr. 345.)  Treatment providers diagnosed White with a closed head injury and concussion.  (*Id.*)  On July 3, 2013, White returned to the emergency room, complaining of a "persistent" headache, dizziness, lethargy, and sensitivity to noise and light.  (*Id.* at 343.) White rated her pain as a 7-8/10 and described it as throbbing.  (*Id.*)  Treatment providers diagnosed White with a closed head injury without loss of consciousness, migraine, and post-concussive syndrome.  (*Id.* at 344.)

On July 22, 2013, White saw Karla Madalin, M.D., for a neurological consultation.  (*Id.* at 337.) White reported worsening headaches since hitting her head at work.  (*Id.* at 338.)  White told Dr. Madalin she had headaches every two days, lasting from 30 minutes (if she took her medication) up to all day. (*Id.*)  White reported missing two and a half days of work in the past two weeks because of headaches. (*Id.*)  White told Dr. Madalin she had missed approximately three days of work because of headaches before her injury.  (*Id.*)  White also complained of confusion since hitting her head, as well as dizziness, lightheadedness, and mild vertigo, although White had experienced the latter three before hitting her head. (*Id.*)  White also reported decreased recent memory.  (*Id.*)  White told Dr. Madalin resting in a dark room and taking medication relieved her headaches.  (*Id.* at 339.)  Dr. Madalin diagnosed White with post-concussion syndrome and migraines, started her on Topamax, and directed White to continue to take sumatriptan as needed.  (*Id.* at 342-43.)

On January 20, 2014, White saw Dr. Madalin for follow up.  (*Id.* at 334.)  White reported the Topamax was helping "'quite a bit;'" she now was getting headaches once or twice a month, with her headaches lasting two to three days.  (*Id.* at 335.)  Her headaches were shorter since starting Topamax.

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  Further, since White challenges only the ALJ's findings regarding her migraines, the medical evidence is limited to that impairment.

(*Id.*)  White reported leaving work early once since the previous month and told Dr. Madalin she was missing "much less work" since starting Topamax.  (*Id.*)  Dr. Madalin directed White to continue her medications.  (*Id.* at 334-35.)

On June 11, 2014, White saw Todd Hochman, M.D., for an initial evaluation.  (*Id.* at 328.)  White complained of pain, dizziness, nausea, confusion, and sensitivity since her work injury.  (*Id.*)  White reported she had done the best she could and last worked at Macy's in March 2014.  (*Id.*)  White told Dr. Hochman she had started working at the Better Business Bureau in April 2014, but struggled with her job duties because of headaches, memory deficits, and fatigue.  (*Id.*)  The Better Business Bureau ultimately fired White because she could not perform her job duties.  (*Id.*)  White reported headaches, decreased vision, confusion, memory deficit, fatigue, depression, and irritability.  (*Id.*)  On examination, Dr. Hochman found slight imbalance on the Romberg test.  (*Id.* at 329.)  Dr. Hochman referred her to Dr. Mary Vargo at MetroHealth's Concussion Clinic.  (*Id.*)

On June 19, 2014, White saw Maryann Woods, CNP, to establish care.  (*Id.* at 612-613.)  White reported working on computers caused migraines, fatigue, and concentration problems.  (*Id.* at 613.)  White told Woods she had recently began Topamax and now got migraines once or twice a month, and those migraines were relieved with Imitrex.  (*Id.*)  Woods noted White's migraines were under "fair control" and directed her to continue with Topamax and use Imitrex as needed.  (*Id.* at 614.)

On July 30, 2014, White saw Dr. Hochman for follow.  (*Id.* at 327.)  White reported getting headaches multiple times a week and told Dr. Hochman she currently had a headache that had lasted several days.  (*Id.*)  White complained of nausea, blurred vision, difficulty concentrating, and being "very irritable."  (*Id.*)

On September 11, 2014, White saw Dr. Vargo at the Concussion Clinic for an initial evaluation.  (*Id.* at 602.)  White complained of decreased memory and headaches.  (*Id.*)  Regarding her headaches,

4

White told Dr. Vargo that on her current medication she got headaches once or twice a week instead of daily.  (*Id.* at 603.)  White reported her headaches lasted a "variable period of time," and could last up to several days.  (*Id.*)  White also complained of light sensitivity and getting tired, confused, irritable, and depressed easily.  (*Id.*) Upon examination, Dr. Vargo found White "[e]xhibit[ed] prominent cognitive symptoms."  (*Id.* at 606.)  Dr. Vargo noted White's headaches were improved with Topamax.  (*Id.*)  Dr. Vargo found White "very credible" for continuing post-concussive syndrome related to her 2013 head injury.  (*Id.*)  Dr. Vargo noted White "had moderately successful medication management for headaches, but otherwise no real treatment."  (*Id.*)  Dr. Vargo continued White on Topamax and Imitrex for her headaches, started her on Ritalin, and recommended a neuropsychological evaluation.  (*Id.*)

On November 12, 2014, White saw Dr. Hochman for follow up.  (*Id.* at 324.)  White reported getting headaches several times a week; her headaches could last for hours or days.  (*Id.*)  White told Dr. Hochman her headaches were interfering with her routine daily activities.  (*Id.*)  White also complained of sensitivity to light and sound, as well as difficulty with recall.  (*Id.*)  Dr. Hochman noted White was "honest about a past medical history significant for migraines.  She was doing well before June 28, 2013." (*Id.*)

On February 10, 2015, White saw Dr. Hochman for follow up.  (*Id.* at 323.)  White reported continuing to have problems with headaches.  (*Id.*)  Dr. Hochman noted he was still waiting for the neuropsychological evaluation and physical therapy to be approved.  (*Id.*)

On June 4, 2015, White underwent a neuropsychological evaluation with Richard Litwin, PhD. (*id.* at 281.)  White reported problems with confusion, reduced memory, irritability, migraines, light sensitivity, and depression.  (*Id.*)  White told Dr. Litwin she felt her migraines were improving with medication.  (*Id.*)  White reported she stopped taking Ritalin because it made her unable to sleep.  (*Id.*) White also complained of fatigue after minor activity.  (*Id.*)

5

After conducting testing, Dr. Litwin opined White showed impairment in the following areas: (1) some proneness to lose concentration and (2) some minor difficulty with speed of processing and mental quickness.  (*Id.* at 284.)  Dr. Litwin recommended the following with respect to treatment:

- Optimizing sleep to improve cognitive functioning.

- Avoid settings involving excessive sensory stimulation.

- Consider using brain games to improve concentration and mental agility.

- Consider adding additional treatment for depression to attempt to improve daily cognitive skills.

(*Id.*)

On August 4, 2015, White saw Dr. Vargo for follow up.  (*Id.* at 582.)  White reported her "[h]eadaches [were] about the same," although they were less frequent at once a week.  (*Id.* at 583.)  White told Dr. Vargo her headaches usually subsided approximately twenty minutes after taking Imitrex. (*Id.*)  White took Imitrex about once a week.  (*Id.*)  Dr. Vargo noted that while White's depression had worsened, "her other symptoms are trending better, especially the headaches (still good results with Topamax and Imitrex.)"  (*Id.* at 585.)  Dr. Vargo found White's headaches "improved."  (*Id.*)

On October 13, 2015, White saw Dr. Vargo for follow up.  (*Id.* at 572.)  White told Dr. Vargo she had experienced "constant headaches for a three week period" during which she had a sinus infection.  (*Id.* at 573.)   However, since then her headaches had returned to their usual pattern.  (*Id.*)  White reported her primary care physician recommended switching from Topamax to Nortriptyline, and White was in the process of transitioning medications.  (*Id.*)  While Imitrex worked well for her, White told Dr. Vargo it knocked her out.  (*Id.*)  Dr. Vargo noted White's headaches and cognitive symptoms were "about the same," but found "[o]verall modest improvement."  (*Id.* at 575.)

6

On December 15, 2015, White saw Dr. Vargo for follow up.  (*Id.* at 556.)  White reported having a migraine for the past two days; she had taken Imitrex the day before, which had helped for a while.  (*Id.*)  Overall, White told Dr. Vargo her headaches had been worse.  (*Id.*)  Dr. Vargo noted that since White's last visit, she had "marked worsening of sleep disturbance" which was worsening her other symptoms, including her headaches and mental processing.  (*Id.* at 559.)  Dr. Vargo commented White was now off Topamax and that it was "unclear" whether that factored into the worsening of White's headaches.  (*Id.*)

On March 15, 2016, White saw Dr. Vargo for follow up.  (*Id.* at 546.)  White reported getting migraines less often.  (*Id.* at 547.)  Dr. Vargo noted White's headaches were improved.  (*Id.* at 548.)  Dr. Vargo stated, "Concussion symptom profile actually showing slow but consistent gains, which was reviewed with patient."  (*Id.* at 549.)

On April 12, 2016, White saw Dr. Hochman for follow up.  (*Id.* at 316.)  White told Dr. Hochman she was still getting regular headaches, and they sometimes lasted for days at a time.  (*Id.*)

On May 10, 2016, White saw Dr. Vargo for follow up.  (*Id.* at 541.)  White complained of impaired balance and a recent fall.  (*Id.*)  White reported she had been at church, which was emotionally and mentally demanding, and sang a solo for the first time.  (*Id.*)  She had forgotten the words at one point.  (*Id.*)  White told Dr. Vargo the past week had been "bad," and she had taken Imitrex four to five times.  (*Id.*)  Dr. Vargo described White's headaches as "variable."  (*Id.* at 543.)  Dr. Vargo noted "[O]verall, she feels that in the big picture she's gradually improving and I agree."  (*Id.* at 544.)

On June 22, 2016, White saw Deanna Bouman, PT, for a physical therapy neurological evaluation.  (*Id.* at 530.)  White reported experiencing migraine headaches two to three times a week, with neck and shoulder pain as well.  (*Id.* at 531.)

7

On July 19, 2016, White saw Dr. Hochman for follow up. (*Id.* at 315.) While White still experienced headaches, they had decreased to three times a week. (*Id.*) Dr. Hochman noted White was in mild to moderate discomfort. (*Id.*)

On August 17, 2016, White saw PT Bouman for follow up. (*Id.* at 480.) White reported she was getting headaches a few times a week, and mainly had issues with "busy environments" such as church or stores, as well as the dark. (*Id.*)

On August 23, 2016, White saw Elizabeth Galvin, OTA, for her second occupational therapy session. (*Id.* at 478.) During the visual perception circuit, White needed two breaks because of eye strain and fatigue. (*Id.*) During the visual scanning, attention, and memory task, White needed several breaks because of dizziness, and she could not complete the task. (*Id.*) During the door saccades, White needed two breaks because of dizziness and eye fatigue. (*Id.*)

On August 30, 2016, White saw Galvin for her fourth occupational therapy session. (*Id.* at 473.) White complained of a headache during the visual perceptual circuit that she rated as a 1/10 and which did not change by the end of the exercise. (*Id.* at 474.) Galvin noted an increase in mistakes towards the end of the exercise because of mental fatigue. (*Id.*) White took breaks every ten minutes. (*Id.*) Galvin commented that White was getting better at knowing when to take breaks before her symptoms increased "significantly." (*Id.*)

On September 15, 2016, White saw Galvin for her fifth occupational therapy session. (*Id.* at 470.) White reported she had missed her last session because of a migraine. (*Id.*) White told Galvin she had started a headache diary as recommended at the previous session. (*Id.*) White reported she had a headache that she rated a 1/10. (*Id.*) Galvin noted that White completed convergence exercises for ten minutes with occasional short breaks. (*Id.* at 471.) White's symptoms of dizziness and fatigue increased

from 0/10 to 2/10 and 3/10, respectively.  (*Id.*)  Galvin noted White had a "slight decrease" in symptoms following a six-minute break.  (*Id.*)

On September 20, 2016, White saw Galvin for her sixth occupational therapy session.  (*Id.* at 467-68.)  White reported she had missed her last session because of a migraine.  (*Id.* at 468.)  Galvin noted White completed 30 minutes of light cognitive tasks before developing a migraine.  (*Id.*)  During those 30 minutes White worked at a slow pace and took "at least" five breaks.  (*Id.*)  White rated her headache pain as a 5/10 and asked to lay down for the remainder of the session.  (*Id.*)  Galvin noted White took Imitrex during the session.  (*Id.*)

On September 29, 2016, White saw Galvin for her seventh occupational therapy session.  (*Id.* at 466.)  White told Galvin she was "great," although she had a headache she rated as a 3/10.  (*Id.*)  Galvin assessed White as follows: "Pt arrives with bright affect, improved overall standing from past session. Pt scanning vertically without issues, horizontal scanning difficult at times, fatigues somewhat easily with these tasks.  Mental math card game difficult in quiet room. Pt making slight progress."  (*Id.* at 467.)

On October 13, 2016, White saw Galvin for her ninth occupational therapy session.  (*Id.* at 460.)  White reported she was keeping a journal of her daily activities, pain levels, and the length of time she could work before her pain levels increased.  (*Id.*)  White told Galvin she had a headache which she rated as a 0/10.  (*Id.*)  White worked on a visual scanning attention exercise for 15 minutes, took a one to two-minute break, and then worked for 12 more minutes, which Galvin noted was an improvement.  (*Id.*)  However, White worked at a slow pace and her pain level increased to a 2/10.  (*Id.*)  White completed seven minutes on an armbike, which decreased her headache pain.  (*Id.*)  White then completed a visual scanning exercise at an appropriate pace, with 100% accuracy, and no increase in symptoms.  (*Id.*)  Galvin noted White arrived at the session with a bright affect and no complaints of pain.  (*Id.* at 461.)  Galvin recommended White increase her activity level, as exercise releases endorphins and allows a break from

9

office activities. (*Id.*) Galvin noted White was able to work longer on more difficult tasks with less pain and symptoms. (*Id.*)

On October 25, 2016, White saw Dr. Vargo for follow up. (*Id.* at 455.) White reported she had been keeping a headache log, and she "noticed that she gets 2-3 migraines/week that last a day or two, which is more than she thought." (*Id.* at 456.) White also complained of a lot of mental fatigue. (*Id.*) White told Dr. Vargo she had attended an eight-hour class three days before, but she only lasted 3 hours and was "still recovering from it." (*Id.*) Dr. Vargo noted White stated she was disappointed she had not improved more. (*Id.*) Dr. Vargo determined White was improving overall, but "very slowly." (*Id.* at 459.) Dr. Vargo referred White to the Gerson Center to determine the appropriateness of, and White's eligibility for, the Work Matters program and continued White's Imitrex. (*Id.*) White was to take Robaxin as needed. (*Id.*)

On October 27, 2016, White saw Dr. Hochman for follow up. (*Id.* at 314.) White reported she continued to get headaches on a regular basis of several times a week, although they had decreased in frequency. (*Id.*)

On November 10, 2016, White saw Doreen Jones for her ninth speech-language pathology session. (*Id.* at 449.) Although White complained of neck pain that she rated as a 3/10, she wanted to continue the session. (*Id.*) Jones noted White was pleasant and cooperative, and returned completed homework. (*Id.*) White completed an attention worksheet with 98% accuracy and an auditory comprehension exercise with 100% accuracy. (*Id.* at 449.)

On January 4, 2017, White saw Dr. Vargo for follow up. (*Id.* at 443-44.) White told Dr. Vargo her psychologist did not think she was ready for the Work Matters program because of her depression and migraines. (*Id.* at 444.) White reported her migraines were "acting up;" her most recent migraine lasted four days. (*Id.*) White told Dr. Vargo she was getting to two to three headaches a week where she had

10

bifrontal pain, nausea, dizziness, and sensitivity to light and sound.  (*Id.*)  White reported trying to push herself more in her activities of daily living, including singing in a choir for MLK weekend, which was a short-term but "relatively intense commitment." (*Id.*)  Dr. Vargo stated:

> Considered Work Matters evaluation but patient reports her psychologist has advised against this as not being ready. Also reports postconcussive headaches as worse recently, which aggravates her depression. On the other hand, she does note that in the big picture migraines have improved with switch from Topamax to Nortriptyline with [sic] was about a year ago (Oct 2015). In fact, until today I do not recall headaches as being the major barrier to her moving forward (rather, depression, cognitive changes, and fatigue).

(*Id.* at 447.)  Dr. Vargo increased White's Nortriptyline to target headaches and decreased her Trazodone. (*Id.*)  Dr. Vargo noted that if White received limited benefit from these medication changes, she should take a break from the clinic until she is ready for the Work Matters program and see a neurologist for headache management. (*Id.*)

On February 7, 2017, White saw Dr. Hochman for follow up.  (*Id.* at 313.)  White told Dr. Hochman she was "doing everything she can to get by but she is frustrated." (*Id.*)  White reported headaches on a regular basis that could be made worse with weather changes.  (*Id.*)  White told Dr. Hochman she had been tracking her headaches, and she had 12 headaches in the past 22 days. (*Id.*)  White reported some of her headaches lasted several days.  (*Id.*)   Dr. Hochman noted White was in obvious moderate discomfort.  (*Id.*)  On examination, Dr. Hochman found tenderness and trigger points.  (*Id.*)

On February 22, 2017, White saw Dr. Vargo for follow up.  (*Id.* at 438-39.)  White told Dr. Vargo she did not think the increased dose of Nortriptyline improved her headaches.  (*Id.* at 439.)  White stated she had been using an app to track her headaches, and she had had 18 days of headaches in the past month. (*Id.*)  White estimated she had taken Imitrex 12 times in the past month.  (*Id.*)  White had not tracked her headaches before, so she was unsure how the month prior compared, and she admitted her "sense of time

11

is easily distorted." (*Id.*)  White reported she had not had any headaches in the past three days. (*Id.*)  Dr. Vargo noted:

> Since the last visit, mixed picture. Last time, Nortriptyline dose was increased because patient expressed that a preceding switch from Topamax to Nortriptyline, about a year ago, had helped her headaches. Initially, she describes that her headaches have been worse of the past month, and she also feels more depressed, and that psychiatrist is considering stopping the Nortriptyline and adding Cymbalta. But upon more in-depth discussion, she's been sleeping better (possibly some credit to the Nortriptyline), has had no headache past 3 days, and overall symptom score today is the best it has been in some time.  Her effect is less depressed.  So it may be a bit soon to give upon the Nortriptyline.  She's effectively using a migraine tracker app for her headaches.

(*Id.* at 442.)

Dr. Vargo continued White's current medications, stating she wished to give the Nortriptyline at least another month, and advised White to continue tracking her headaches. (*Id.*)  Dr. Vargo also referred White to neurology for headache management. (*Id.*)

On May 9, 2017, White saw Dr. Hochman for follow up. (*Id.* at 312.)  White again reported getting headaches on a regular basis and told Dr. Hochman her medications could be "incapacitating." (*Id.*)  Dr. Hochman noted White was in moderate discomfort. (*Id.*)  On examination, Dr. Hochman found some tenderness and trigger points at the insertion of the trapezii into the occiput. (*Id.*)

On May 30, 2017, White saw Joseph Hanna, M.D., for a neurological evaluation. (*Id.* at 430.)  White rated her headache pain as a 4/10. (*Id.* at 432.)  Dr. Hanna noted White had "[c]hronic daily headaches" and discussed the need for alternative prevention strategies. (*Id.* at 433.)  Dr. Hanna directed White to wean off Pamelor, start Calan, continue taking Imitrex as needed, and to follow up in two months. (*Id.* at 434.)

On June 14, 2017, White saw Dr. Vargo for follow up. (*Id.* at 425-26.)  White reported no improvement in her headaches on her new medication. (*Id.* at 426.)  While her headaches got worse

during the transition period, they were now at their previous level.  (*Id.*)  White complained of a bad headache and told Dr. Vargo the office lights bothered her.  (*Id.*)  White reported she had "21' attack days' with migraines" in the past month and lies down when this happens.  (*Id.*)  White told Dr. Vargo on a few days she could have kept going, but she "usually cannot do much as her confusion and balance tends to get worse in association with the headaches."  (*Id.*)  White reported feeling "unusually off balance" the day before, although she was better that day.  (*Id.*)  White told Dr. Vargo her headaches were the main barrier to her working.  (*Id.*)  Dr. Vargo opined White had reached the limits of what Dr. Vargo had to offer.  (*Id.* at 429.)  Dr. Vargo noted White's symptom scores had remained "generally in the same range, despite extensive care . . . ."  (*Id.*)  Dr. Vargo tried to explain to White that this was "her 'new normal'" and referred her to Gerson Center for information on the Work Matters program.  (*Id.*)  Dr. Vargo also encouraged White to complete Social Security applications.  (*Id.*)

On July 31, 2017, White saw Dr. Hanna for follow up.  (*Id.* at 414.)  White reported thirteen headaches in the past month.  (*Id.* at 415.)  White told Dr. Hanna her typical headaches cause bifrontal pain and last days, with Imitrex being the best medication yet.  (*Id.*)  White rated her current pain as a 1/10.  (*Id.* at 417.)  Dr. Hanna discussed chronic disease management with White, increased her dose of Calan, and told her to continue to take Imitrex as needed.  (*Id.* at 418.)  White was to follow up in six months.  (*Id.*)

On August 2, 2017, White went to the Gerson Family Resource Center to discuss community resources.  (*Id.* at 413.)  Cheryl Crahen, CRC, PC, gave White a handout on reiki as another pain management option for her headaches.  (*Id.*)  Crahen noted White "demonstrated no overt pain issues, other than taking medication towards the end of our session since she felt her headache getting worse." (*Id.*)  White reported having gone to an all-day activity over the weekend and had "paying" for it with a bad headache over the past few days.  (*Id.*)  White asked Crahen if there was a job she could do from

13

home because of her frequent headaches. (*Id.* at 414.) White told Crahen she had not applied for Social Security disability benefits since she had hoped to have returned to work a lot sooner. (*Id.*) Crahen gave White a list of attorneys to assist with applying for disability benefits. (*Id.*)

On August 10, 2017, White saw Dr. Hochman for follow up. (*Id.* at 311.) White reported headaches in the temporal region on a "fairly regular basis" and that she was now on Verapamil. (*Id.*) Dr. Hochman noted White had a "legitimate concern" about her regular headaches that could be incapacitating interfering with her attendance at a regular job. (*Id.*)

On November 16, 2017, White saw Dr. Hochman for follow up. (*Id.* at 310.) White complained of a "fairly significant headache" during her appointment. (*Id.*) Dr. Hochman noted White's eyes were a little squinted on examination. (*Id.*)

On December 19, 2017, White saw Dr. Vargo for follow up. (*Id.* at 762-63.) White reported her Verapamil had been increased, which she felt helped somewhat, but she still had frequent migraines. (*Id.* at 763.) White complained of headaches a few times a week on average, which could last anywhere from a few hours to all week. (*Id.*) White told Dr. Vargo she had a migraine that day. (*Id.*)

On January 3, 2018, White saw Dr. Hanna for follow up. (*Id.* at 759.) White told Dr. Hanna she had been better since her Calan was increased. (*Id.* at 760.) White reported four migraines in the past month and 20 days of headaches. (*Id.*) Dr. Hanna increased White's Calan dosage, continued her on Imitrex as needed, and advised her to make lifestyle modifications. (*Id.* at 762.)

On February 22, 2018, White saw Dr. Hochman for follow up. (*Id.* at 717.) White reported headaches two times a week, although they were not as bad. (*Id.*) Dr. Hochman noted he thought White was an appropriate candidate for vocational rehabilitation. (*Id.*)

On March 27, 2018, White met with Crahen again regarding vocational services. (*Id.* at 734.) White reported her migraines were under better control with her medications; she got migraines twice a

14

week now instead of daily.  (*Id.*)  Crahen noted that White had made some progress during occupational therapy, but White did not describe the progress and instead focused on her overall limitations.  (*Id.*)

On May 31, 2018, Dr. Hochman completed a Headaches Medical Source Statement.  (*Id.* at 799-802.)  Dr. Hochman reported White suffered from moderately severe headaches.  (*Id.* at 799.)  Associated symptoms included vertigo, nausea/vomiting, photophobia, throbbing pain, inability to concentrate, phonophobia, mood changes, and mental confusion.  (*Id.*)  Dr. Hochman stated White experienced three to seven headaches a week, lasting multiple hours.  (*Id.*)  Bright lights, noise, vigorous exercise, and weather changes triggered White's headaches.  (*Id.* at 800.)  Bright lights, moving around, and noise exacerbated White's headaches, while taking medication, water, a quiet place, and a dark room alleviated them.  (*Id.*)  Dr. Hochman opined White could perform low stress work, although she may have difficulty doing so because of her headaches.  (*Id.*)  Dr. Hochman further opined White would need unscheduled breaks every 10-15 minutes for 10-15 minutes at a time, and she would need to lie down or sit quietly during such breaks.  (*Id.* at 801.)  Dr. Hochman determined White would be off-task 25% or more of the time, she would have good days and bad days, and she would miss more than four days a month because of her symptoms.  (*Id.*)

White completed a headache log for May 2018.  (*Id.* at 272.)  She recorded 27 headache days, and her headaches lasted 13 to 24 hours on 20 of those days.  (*Id.*)  White took Imitrex 8 days that month.  (*Id.*)

On June 19, 2018, White saw Dr. Vargo for follow up.  (*Id.* at 917.)  While White reported some benefit from Verapamil, her tracking showed her headaches were "still substantially occurring."  (*Id.* at 918.)  Using a tracking app on her phone, White told Dr. Vargo she got about six headaches a month, some of them lasting up to four to five days.  (*Id.*)  White felt they were "'real migraines.'"  (*Id.*)

On June 26, 2018, White saw vocational rehabilitation counselor Meggan Few.  (*Id.* at 928-29.)  White explained her injury at work and the impact it had on her functioning.  (*Id.* at 928.)  White still got

15

headaches, although they were not as debilitating, she had low stamina, she needed frequent breaks, and she napped daily.  (*Id.*)  White told Few she was unsure about her ability work; she felt her headaches would continue and cause her to miss too much work.  (*Id.* at 929.)  However, White was young, and she wanted to do something.  (*Id.*)

White completed a headache log for June 2018.  (*Id.* at 273.)  She recorded 15 headache days, and her headaches lasted 13 to 24 hours on 12 of those days.  (*Id.*)   White took Imitrex seven times that month.  (*Id.*)

On July 17, 2018, White saw Dr. Hanna for follow up.  (*Id.* at 939.)  White reported she had more days than not with a migraine headache, although Calan made them less severe.  (*Id.* at 941.)  White estimated she took Imitrex about three times a week.  (*Id.*)   Dr. Hanna diagnosed White with intractable migraine headaches.  (*Id.* at 944.)  He discussed behavior modification with White and continued her current medications.  (*Id.*)

White completed a headache log for July 2018.  (*Id.* at 274.)  She recorded 23 headache days, and her headaches lasted from 13 to 24 hours on 21 of those days.  (*Id.*)  White took Imitrex 10 times that month.  (*Id.*)

On August 5, 2018, White went to the emergency room complaining of dizziness that had started the night before, headache, and nausea.  (*Id.* at 982.)  White told treatment providers she did not eat a lot the day before and was in the sun, although she drank plenty of water.  (*Id.*)  White reported she felt better than she did yesterday, but she was still dizzy.  (*Id.*)  White rated her pain as a 6/10 and described it as dull and constant.  (*Id.*)  Treatment providers administered Reglan, Benadryl, and Tylenol, and White felt much better.  (*Id.* at 986.)  White reported her light sensitivity and dizziness had resolved, and her pain had decreased to a 2/10.  (*Id.*)

16

On August 16, 2018, Few wrote a report summarizing the vocational assessment conducted of White on July 10, 19, and 26.  (*Id.* at 1018-28.)  Few noted the following observations:

> Each day she came in she reported having a headache/migraine but wanted to try to work through them since they tend be her "normal" state. Deidre required frequent breaks (both during and between assessments) for extended periods of time (sometimes she needed just a minute while other times she needed as long as twenty minutes) along with reduced overall testing time (unable to test for longer than two hours.)  We needed three appointments (average testing time is two appointments) to complete the assessment due to these breaks and limitations in stamina. For paper/pencil assessments and the Valpar assessments she required reduced lighting.  For assessments on the computer we turned the lights off altogether.

(*Id.* at 1021.)  On the third day of testing, White had to stop in the middle of a test as her headache pain became too much to work through.  (*Id.*)  White needed a 20-25-minute break to take her medication and allow it to kick in.  (*Id.* at 1025.)  Few noted working on the computer was challenging for White because of her migraines.  (*Id.* at 1023.)

Few determined White's vocational barriers included: (1) reduced stamina with need for frequent breaks; (2) slower pace with independent problem-solving work sample; (3) frequent and persistent migraine headaches; (4) limited concentration and focus, easily distracted; (5) difficulty scanning information; and (6) four-year employment gap.  (*Id.* at 1026-27.)  Few stated it was "important to note that with frequent breaks Deidre is able to successfully complete tasks."  (*Id.* at 1027.)  Few determined White appeared to be a good candidate for the Work Matters program.  (*Id.*)

On August 30, 2018, White saw Dr. Hochman for follow up.  (*Id.* at 812.)  White reported she had had "some difficulty" with the vocational rehabilitation assessment, but she had gotten through it.  (*Id.*)  On examination, Dr. Hochman found White in mild to moderate discomfort.  (*Id.*)

17

White completed a headache log for August 2018.  (*Id.* at 275.)  She recorded 21 headache days, and her headaches lasted 13 to 24 hours on 15 of those days.  (*Id.*)  White took Imitrex 5 times that month. (*Id.*)

On September 5, 2018, White began the Work Matters program.  (*Id.* at 1046.)  White completed one hour of the three-hour session before she had to take her migraine medication, and Few needed to dim the lights for her.  (*Id.*)  On September 10, 2018, Few noted that after an hour and fifteen minutes it became "noticeable" that White had a headache that was getting worse.  (*Id.* at 1056.)  White confirmed she had a headache and closed her eyes for a minute.  (*Id.*)  White was then able to complete the session. (*Id.*)  White told Few at the end of the session that while her head hurt, she did not need to take her migraine medication; she just needed to go home and rest.  (*Id.*)  On September 12, 2018, Few noted White had done rather well that day; while she dimmed the lights for White at break time so she could rest, White did not have to take any medication.  (*Id.* at 1061.)  On September 17, 2018, Few noted White had missed the past session because of a migraine headache.  (*Id.* at 1076.)  White told Few her migraine was still bothering her, and she took her medication shortly after arriving.  (*Id.*)  However, White was able to participate for the entire session.  (*Id.*)  On September 24, 2018, White reported she felt "pretty good" that day.  (*Id.* at 1086.)  She needed a break at 10:15 and took her migraine medication.  (*Id.*)  Few noted that once her medication kicked in, White did well and was able to participate in the rest of the session. (*Id.*)  On September 26, 2018, White "developed a significant migraine about an hour into the session." (*Id.* at 1091.)  White took her migraine medication and asked for the lights to be turned down; after 30 minutes she felt better and was able to participate in the session.  (*Id.*)

On October 3, 2018, White arrived feeling better and reported she was "very proud she had received her ministry certification."  (*Id.* at 1111.)  Approximately 15 minutes into the session, White began to feel unwell.  (*Id.*)  She placed a cool cloth on her neck, ate some crackers, and drank some ginger

18

ale, thinking her blood sugar was the issue.  (*Id.*)  By 9:45 a.m., White was unable to continue with the session and told Few she thought she may need to go to the emergency room.  (*Id.*)  Few arranged for White to be transported to the Emergency Department by wheelchair.  (*Id.*)  At the emergency room, White complained of dizziness, headache, and nausea that got worse when she moved around.  (*Id.* at 1117.)  White had already taken an Imitrex, which brought her pain down from an 8/10 to a 6/10.  (*Id.*)  A neurological exam was normal, and treatment providers commented White "look[ed] great in regards to her migraine and [was] in no objective discomfort" at the moment.  (*Id.* at 1121.)

On October 10, 2018, Few noted White did well and was able to participate for the entire session without any additional breaks.  (*Id.* at 1157.)

On October 16, 2018, White saw Sara Seegert, APN-CNP, with complaints of a migraine.  (*Id.* at 1168.)  White reported her migraines had worsened since starting the Work Matters program, which she was to finish next week.  (*Id.*)  White stated she was getting migraines daily now, and they lasted for days.  (*Id.*)  Imitrex no longer worked unless it was a "'baby'" migraine, and Verapamil was not working either.  (*Id.*)  Associated symptoms included nausea and sensitivity to light and sound.  (*Id.*)  Seegert noted she had a "[l]ong discussion regarding current migraines and need for change of treatment."  (*Id.* at 1172.)  White wanted to wait until after she completed the Work Matters program before making any changes;  White felt her current schedule was worsening her migraines and wanted to reevaluate after the program.  (*Id.*)

On October 17, 2018, White attended her seventh Work Matters session.  (*Id.* at 1176.)  Few noted White's head began to hurt during the first half of the session.  (*Id.*)  While White was "visibly in pain," she was able to continue with the session.  (*Id.*)

On October 31, 2018, White saw Dr. Vargo for follow up.  (*Id.* at 1195.)  White told Dr. Vargo she had completed the first phase of the Work Matters program; while she found it helpful, it caused an

aggravation of her headaches.  (*Id.*)  White expected her headaches to return to their previous levels now that the classroom part of the Work Matters program was over.  (*Id.* at 1196.)

On January 17, 2019, White saw Dr. Hanna for follow up.  (*Id.* at 1331.)  White reported the Imitrex was okay sometimes.  (*Id.* at 1333.)  While her headaches were better on Calan, she still got one to two headaches a month that lasted two to three days.  (*Id.*)  Dr. Hanna continued White's medications. (*Id.* at 1336.)

On February 4, 2019, Dr. Vargo completed a Headaches Medical Source Statement.  (*Id.* at 1319-24.)  White experienced severe headaches three to four times a week, with the approximate duration ranging from three to four hours up to one week.  (*Id.* at 1319.)  Associated symptoms included vertigo (dizziness/off-balance), nausea, exhaustion, sensitivity to light and sound, and mental confusion.  (*Id.*) Hunger, lack of sleep, stress, strong odors, and mental exertion triggered White's headaches.  (*Id.* at 1321.)  Bright lights and moving around exacerbated White's headaches, while lying down in a quiet room, sleeping, and occasionally medication alleviated them.  (*Id.*)  Dr. Vargo opined White was incapable of even low stress work because of her frequent headaches and a need to rest during episodes. (*Id.*)  Dr. Vargo explained White had only had a modest response to treatment and Imitrex made her sleepy.  (*Id.* at 1323.)  Dr. Vargo opined White would need a 20-minute break every 15 to 20 minutes or mental exertion would trigger headaches.  (*Id.*)  During those breaks, she would need to either lie down (preferred) or sit quietly in a dark, quiet room.  (*Id.*)  Dr. Vargo opined White would have "good days" and "bad days," would be off-task 25% or more of the workday, and would miss more than four days of work per month because of her symptoms.  (*Id.*)

C.    **State Agency Reports**

On January 9, 2018, state agency medical consultant Timothy Budnik, D.O., opined White could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for

about six hours in an eight-hour workday, and sit for about six hours in an eight-hour work day.  (*Id.* at 64-66.)  Dr. Budnik explained these limitations were necessary because of White's post-concussive syndrome.  (*Id.* at 65.)  White could never climb ladders, ropes, or scaffolds because of her dizziness, although she could occasionally climb ramps and stairs.  (*Id.*)  White could frequently balance and occasionally stoop, kneel, crouch, and crawl.  (*Id.*)  White must avoid concentrated exposure to noise because of her migraines and must avoid all exposure to hazards because of her dizziness.  (*Id.* at 66.)

On May 4, 2018, Gerald Klyop, M.D., affirmed Dr. Budnik's findings on reconsideration.  (*Id.* at 79-82.)

**D.      Hearing Testimony**

During the March 5, 2019 hearing, White testified to the following:

- She has undergone treatment for her migraine condition, consisting of occupational therapy, speech therapy, medication, dietary changes, and lifestyle changes.  (*Id.* at 42.)  She has tried Topamax and a few other medications for her headaches.  (*Id.*)  Right now, she is on Verapamil.  (*Id.*)  She takes Imitrex when she gets a migraine, but it does not work very well.  (*Id.*)  Imitrex makes her very tired and after taking it she needs to lay down and sleep.  (*Id.* at 45.)

- While her headaches were better than when they first started, she still gets headaches three or four days a week.  (*Id.* at 43.)  Her headaches have not improved beyond that.  (*Id.*)

- When she gets headaches, she usually gets nauseous and sometimes gets dizzy and off-balance.  (*Id.*)  It is difficult for her to find her words.  (*Id.*)  Light hurts her eyes, and she is very sensitive to sounds and smells.  (*Id.*)  Most of the time she needs to lay down.  (*Id.*)

- She tried working after the onset date at the Better Business Bureau.  (*Id.*)  It was hard for her to stay focused after an hour of training.  (*Id.* at 44.)  She was getting migraines every day at that point, so halfway through the day she would need to take a migraine pill, which would make her sleepy.  (*Id.*)  Then the next day, she would forget what she had learned the day before.  (*Id.*)

- She went through the Work Matters program, which helps people with brain injuries identify a job they may want to pursue and getting them used to having someplace to go a few times a week.  (*Id.* at 44-45.)  It was three hours a day, three times a week,

and White was unable to go every day.  (*Id.* at 45.)  Some days she would have to leave early.  (*Id.*)  Staff tried adjusting the lights for her and they allowed her to have snacks to keep blood sugar stable, but at the end staff told her they did not think she could work.  (*Id.*)

- She can drive, but a lot of times her mother will drive her when she has to go somewhere because she will be too tired, or she gets lost.  (*Id.* at 47.)  She drives a couple of times a week, usually only when she has an appointment that is set for a time when her mother is at work.  (*Id.* at 48.)

- During the Work Matters program, she had to take a 10-15-minute break every 20 minutes or so.  (*Id.* at 49.)  She would need to take a break because her head would start hurting, or it would be harder for her to focus, or she would get confused.  (*Id.*)

The VE testified White had past work as an administrative clerk, case aide, social services aide, and china/glassware/silverware salesperson. (*Id.* at 50.)  The ALJ then posed the following hypothetical question:

> I'd like you to assume an individual who is 46 years old, has three-plus years of college, can read and write, perform arithmetic, has the work background to which you testified.  This individual is limited to work on light exertional requirements, but has additional non-exertional limitations, specifically no climbing of ladders, ropes, or scaffolds; occasionally climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; no concentrated exposure to temperature extremes, humidity, environmental pollutants, high background noise, or strong lighting, as in a factory setting; no exposure to hazards, such as heights, machinery, commercial driving; and mental limitation that she perform routine tasks in a low-stress environment, specifically no fast pace, strict quotas, or frequent duty changes.  Could this individual perform past work?

(*Id.* at 52.)

The VE testified the hypothetical individual would not be able to perform White's past work as an administrative clerk, case aide, social services aide, and china/glassware/silverware salesperson.  (*Id.*)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as cashier II, sales attendant, and merchandise marker.  (*Id.* at 52-53.)

22

The ALJ modified the hypothetical to add that the hypothetical individual would be off-task at least 20% of the time. (*Id.* at 53.) The VE testified no jobs could be sustained with that limitation. (*Id.*)

Counsel for White asked the VE whether a hypothetical individual who would be absent from work at least three times a month on an ongoing basis would be able to maintain employment. (*Id.* at 54.) The VE testified such an individual would not be able to maintain employment. (*Id.*)

Counsel for White asked the VE whether a hypothetical individual who would need to periodically leave their workstation to lie down after taking their medication until it relieved their symptoms would be tolerated in the workplace. (*Id.*) The VE testified that it would not be tolerated in the workplace. (*Id.* at 55.)

### III.     STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, and 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.

23

20 C.F.R. § 404.1520(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, White was insured on her alleged disability onset date, April 1, 2014, and remained insured through December 31, 2019, her date last insured ("DLI.") (Tr. 15.) Therefore, in order to be entitled to POD and DIB, White must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2.    The claimant has not engaged in substantial gainful activity since April 1, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*).

24

3. The claimant has the following severe impairments: post-concussive syndrome with mild neurocognitive disorder, adjustment disorder with depression, morbid obesity, migraines, asthma, and lumbar degenerative disc disease (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity (20 CFR 404.1545) to perform light work as defined in 20 CFR 404.1567(b), except the claimant can never climb ladders, ropes or scaffolds, but can occasionally climb ramps and stairs; can occasionally perform balancing, stooping, kneeling, crouching and crawling; cannot have concentrated exposure to temperature extremes, humidity, environmental pollutants, high background noise or strong lighting, as in a factory setting; cannot have any exposure to hazards (heights, machinery, commercial driving); and mentally, the claimant is limited to performing routine tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes) (20 CFR 404.1569a).

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on January **, 1973 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2014, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 17-30.)

25

## V.    STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec*., 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

White argues in her first assignment of error that the ALJ failed to properly evaluate the opinions of Drs. Hochman and Vargo under the revised regulations concerning the evaluation of medical source opinions. (Doc. No. 17 at 18.)  White asserts that because the opinions of Drs. Hochman and Vargo are at least equally supported and consistent with the record as the opinions of the state agency reviewing physicians, the ALJ was required to address the other regulatory factors and failed to do so.  (*Id.*)  In addition, White argues the ALJ selectively parsed the evidence in supporting his determination that the opinions "lack[ed] support from the claimant's medical records, which show improvement in her

headaches over time" and were "inconsistent with her performance on testing including the June 2015 neuropsychological evaluation; November 2016 speech-language therapy testing; and July 2018 Individualized Vocational Evaluation." (*Id.* at 18-22.)

The Commissioner responds that substantial evidence supports the ALJ's RFC finding. (Doc. No. 19 at 9.) The Commissioner asserts, "Only if an ALJ finds multiple opinions are 'equally' well-supported and consistent with the record" must the ALJ go on to consider the additional regulatory factors; since the ALJ did not make any such finding here, the ALJ was not required to consider the additional regulatory factors. (*Id.* at 11.) The Commissioner further argues that the record evidence does not support White's argument that the opinions of Drs. Hochman and Vargo are consistent with evidence showing White needed regular breaks during testing. (*Id.* at 12.) In addition, the Commissioner asserts that with respect to the July 2018 notes from Megan Few, C.R.C., White asks the Court to reweigh evidence the ALJ considered and discussed. (*Id.* at 13.)

Since White's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[4] (2) consistency;[5] (3) relationship with the claimant,

---

[4] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her

28

including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. §§ 404.1520c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. § 404.1520c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1)  Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.
>
> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this

---

medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).
[5] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a) & (b)(1), 416.920c(a) & (b)(1)). A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

With respect to White's migraines, the ALJ found as follows:

The claimant alleged that he could not work due to post-concussive syndrome, migraines and depression (Ex. 3E/2). In particular, the claimant testified that as of the alleged onset date, she was experiencing migraine headaches on a daily basis with associated nausea, dizziness, sensitivity to light and sound, and poor concentration (Testimony. As a result, the claimant underwent occupational/speech therapy; attempted lifestyle/diet changes; and she has been prescribed medications such as Topamax, Verapamil and Imitrex, but she continues to experience 3 to 4 migraine headaches per week (Testimony). In addition, the claimant noted that when she takes Imitrex at the onset of a headache, it makes her very drowsy and she needs to lie down (Id.). The claimant also stated that, due to her ongoing migraines, she began to feel depressed with symptoms, including poor motivation, poor concentration and isolationism (e.g. does not like to be around groups of people) (Id.). Accordingly, the claimant sees a psychiatrist who prescribes her Cymbalta and a mental health counselor (Id.).

The claimant reported that her impairments affect her ability to lift, squat, bend, stand, walk, climb stairs, remember, complete tasks, concentrate, understand, follow instructions and get along with others (Ex. 4E/6).

Based upon all the above, the claimant testified that while she attempted to obtain a job at the Better Business Bureau and participate in a Work Matters Program for 3 hours per day, 3 days per week, she was unable to continue with said work or complete the program, due to absences, poor concentration/memory, and her need for ongoing breaks (Testimony).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

First, in determining the claimant's residual functional capacity, the undersigned took into consideration that, as of the alleged onset date, the claimant was diagnosed with post-concussion syndrome and migraines with associated photophobia, phonophobia, nausea, cognitive symptoms, poor sleep, depression, fatigue, light sensitivity, and irritability (see, e.g., Ex. 4F/5-6, 13; Ex. 5F/153).

That said, the record initially documents some improvement with prescribed treatment. Specifically, in January 2014, the claimant reported that while her headaches occurred approximately once every two days, that resolved within 30 minutes with prescribed medications (i.e. Topamax and Sumatriptan); and in August 2015, the claimant stated that her headaches were occurring once per week and subsides within 20 minutes after taking Imitrex (Ex. 4F/5-6; Ex. 5F/191). Similarly, in May 2016, the claimant's primary care physician, Mary Vargo, M.D., indicated that there was an "overall improving trend" in the claimant's headaches, and that the claimant had recently challenged herself by singing a solo in church for the frist time (Ex. 5F/153).

In addition, while the claimant subsequently reported increased headache activity to Dr. Vargo, it appears that this bout of increased headache activity improved with medication modifications. In particular, in February 2017, the claimant reported to Dr. Vargo that she had 18 days of headaches requiring Imitrex on 12 occasions; and in June 2017, she reported 21 "attack days" with migraines in the prior month (Ex. SF/35, 48). In comparison, in February 2018, the claimant reported to Dr. Hochman that she was experiencing two headaches per week that were not as bad on her treatment regimen of Verapamil, Imitrex and Trazodone; and in June 2018, the claimant acknowledged to Dr. Vargo that she benefited from said treatment, and was experiencing about 6 headaches per month, though some could last up to 4 to 5 days (Ex. 6F/3; Ex. l 7F/47).

31

Also of note, the record does not show that the claimant required emergency room treatment or hospitalizations on a regular basis for her migraines. In fact, when the claimant sought emergency room treatment in October 2018 for a migraine with associated dizziness, her cerebellar neurologic examination was completely normal with a normal gait, normal finger to nose bilaterally and normal heel-shin exam bilaterally, and the claimant was described as looking "great in regards to her migraine" and being "in no objective discomfort" (Ex. 21F/41-45).

Furthermore, objective testing results do not support the alleged degree of memory and concentration limitations arising, in part, from the claimant's migraines. For example, at the June 2015 neuropsychological evaluation conducted by Richard Litwin, Ph.D., had some proneness to lose concentration and some "minor" difficulty with speed of processing and mental quickness, but she obtained a verbal IQ score of 102 (average range) on the Wechsler Adult Intelligence Scale 4; average to low average scores on the California Verbal Learning Test-II (long form) and Brief Visual Spatial Memory Test-R (Ex. 1F/4-5). Likewise, during speech-language therapy in November 2016, Doreen Jones, C.C.C.-S.L.P., indicated that the claimant completed an attention worksheet for homework with 98 percent accuracy; she completed an attention to detail task (i.e. solving codes) in noise with 100 percent accuracy; she read a multi-paragraph text and answered multiple choice, questions with 73 percent accuracy; and she listened to a narrative consisting of 6 to 8 sentences in length and answered questions with 100 percent accuracy (Ex. 5F/58). As another example, at a July 2018 Individualized Vocational Evaluation conducted by Meggan Few, C.R.C., the claimant exhibited reduced stamina, a slow pace, difficulty scanning information and limitation concentration and focus, but she had above average verbal aptitude and clerical perception; high average general learning ability and special aptitude; post high school level reading ability; and she met competitive standards for speed and accuracy on numerical sorting (Ex. 10E/9).

Thus, the undersigned finds that the claimant's migraines only warrant the limitations described in the above residual functional capacity.

(Tr. 22-23.)

Later in his RFC analysis, the ALJ analyzed the opinions of Drs. Hochman and Vargo as follows:

In March 2018, Todd Hochman, M.D., opined that the claimant experienced 3 to 7 moderate to severe headaches per week lasting multiple hours, with associated vertigo, photophobia, throbbing pain, inability to concentrate, phonophobia, mood changes and mental confusion (Ex. 11F/1-4). The claimant's headaches were triggered by bright lights, noise, vigorous exercise and weather changes, and exacerbated by bright lights, moving around and noise (Id.). Due to the

claimant's headaches, she was only capable of low stress work; she would be precluded from performing even basic work activities in the work place; she would require a 10 to 15 minute break after every 10 to 15 minutes of work; she would be off task 25 percent or more of the workday; and she would be absent more than 4 days per month (Id.).

The undersigned finds Dr. Hochman's opinion unpersuasive, as it lacks support from the claimant's medical records, which show improvement in her headaches over time; and it is inconsistent with her performance on testing including the June 2015 neuropsychological evaluation; November 2016 speech-language therapy testing; and July 2018 Individualized Vocational Evaluation (see, e.g., Ex. l0E/9; Ex. 1F/4-5; Ex. 4F/5-6; Ex. 5F/58, 153, 191; Ex. 6F/3; Ex. 1 7F/47). Moreover, in regard to Dr. Hochman's opinion regarding the claimant's inability work, this is an issue reserved for the Commissioner, and thus it was not evaluated pursuant to 20 CPR 404.1520b(c).

In February 2019, Mary Vargo, M.D., opined that the claimant experienced 3 to 4 severe headaches per week lasting 3 hours to 1 week, with associated vertigo, nausea, photophobia, exhaustion, phonophobia, and mental confusion (Ex. 28F/l-6). The claimant's headaches were triggered by hunger, lack of sleep, stress and strong odors, and exacerbated by bright lights and moving around (Id.). Due to the claimant's headaches, she was unable to perform even low stress work; she would be precluded from performing even basic work activities in the work place; she would require a 20 minute break after every 15 to 20 minutes of work; she would be off task 25 percent or more of the workday; and she would be absent more than 4 days per month (Id.).

The undersigned also finds Dr. Vargo's opinion unpersuasive. As was the case with Dr. Hochman's opinion, Dr. Vargo's opinion lacks support from the claimant's medical records, which show improvement in her headaches over time; and it is inconsistent with her performance on testing including the June 2015 neuropsychological evaluation; November 2016 speech-language therapy testing; and July 2018 Individualized Vocational Evaluation (see, e.g., Ex. 10E/9; Ex. 1F/4-5; Ex. 4F/5-6; Ex. 5F/58, 153, 191; Ex. 6F/3; Ex. 17F/47). Moreover, in regard to Dr. Vargo's opinion regarding the claimant's inability work, this is an issue reserved for the Commissioner, and thus it was not evaluated pursuant to 20 CFR 404.1520b(c).

(Tr. 25-26.)

The Court finds the ALJ erred in his evaluation of the opinions of Drs. Hochman and Vargo. Neither of the two reasons given, without further explanation from the ALJ, suffice to support the ALJ's determination that these opinions were unsupported and inconsistent with the record. As White points out,

33

and the ALJ himself acknowledges, while White's headaches varied over time and improved with medication, in February 2018 she reported she was still getting headaches twice a week and in June 2018 she reported she was getting headaches six times a month, with some lasting four to five days.  (Doc. No. 17 at 19; Tr. 22-23.)  In addition, the ALJ failed to discuss at any point in his RFC analysis the headache logs White completed for May through July 2018, which reflected a significant number of headaches that lasted from 13-24 hours.  (Tr. 272-75.)

With respect to White's performance during testing, in his report regarding the June 2015 neuropsychological testing, Dr. Litwin made no mention of whether White suffered from a headache or migraine on the day of her evaluation.  (Tr. 281-84.)  Similarly, during the speech-language pathology testing in November 2016, Jones did not note that White had a headache that day; rather, her notes reflect White had neck pain that she rated as a 3/10 and wanted to continue the session despite her pain.  (*Id.* at 449.)  But most troubling is the ALJ's reliance on the July 2018 vocational evaluation to support his determination regarding the consistency of Dr. Hochman's and Dr. Vargo's opinions.  Few explicitly stated in her report:

> Each day she came in she reported having a headache/migraine but wanted to try to work through them since they tend be her "normal" state. *Deidre required frequent breaks (both during and between assessments) for extended periods of time (sometimes she needed just a minute while other times she needed as long as twenty minutes) along with reduced overall testing time (unable to test for longer than two hours.)  We needed three appointments (average testing time is two appointments) to complete the assessment due to these breaks and limitations in stamina.* For paper/pencil assessments and the Valpar assessments she required reduced lighting.  For assessments on the computer we turned the lights off altogether.

(*Id.* at 1021) (emphasis added).  The ALJ fails to discuss this portion of Few's report or explain how it is inconsistent with Dr. Hochman's opinion that White would need unscheduled breaks every 10-15 minutes

for 10-15 minutes at a time (*id.* at 801), or Dr. Vargo's opinion that White would need a 20-minute break every 15 to 20 minutes or mental exertion would trigger headaches. (*Id.* at 1323.)

As explained in detail above, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877 (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996). Likewise, if relevant evidence is not mentioned, the Court cannot discern whether the ALJ discounted or overlooked the evidence. *Shrader*, 2012 WL 5383120, at *6. Finally, an ALJ may not overlook or ignore contrary lines of evidence. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

Although the new standards are less stringent in their requirements for the treatment of medical opinions, they still require that the ALJ provide a coherent explanation of his reasoning. Here, the ALJ

35

failed to build an accurate and logical bridge from the evidence to his conclusions in his RFC analysis and in his evaluation of the opinions of Drs. Hochman and Vargo.

As this matter is being remanded for further proceedings for proper consideration of the record and medical opinion evidence, and in the interests of judicial economy, the Court will not address White's remaining assignment of error.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED AND REMANDED FOR FURTHER CONSIDERATION CONSISTENT WITH THIS OPINION.

**IT IS SO ORDERED.**

Date: March 8, 2021                                    *s/ Jonathan Greenberg*
                                                                    Jonathan D. Greenberg
                                                                    United States Magistrate Judge